IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ROBERT EARL ALEXANDER,

                Plaintiff,

v.

NATHAN TAPIO and ROMAN KAPLAN,

                Defendants.

ORDER

17-cv-861-jdp

---

Pro se plaintiff Robert Earl Alexander is an inmate at the Dodge Correctional Institution (DCI) who has been diagnosed with throat cancer. Litigation of his Eighth Amendment medical care claims has been stayed while I attempt to recruit counsel. Alexander has filed two motions for temporary restraining orders, Dkt. 115 and Dkt. 119, as well as a motion seeking an extension of time in which to respond to the state's brief in opposition to those motions. Dkt. 127. I will grant Alexander's motion for an extension of time to reply to defendants' response to his first TRO motion, Dkt. 115. As to Alexander's second TRO motion, which focuses specifically on the status of his radiation treatments, I find that additional commentary from Alexander is not likely to be helpful. The point of contention between the parties is simply whether Alexander is physically capable of getting onto the radiation treatment table: Alexander says he can't, and DCI says he can. At this point, the most expeditious way to resolve the parties' factual disputes is to obtain a treatment update from defendants and, if necessary, appoint an independent expert under Rule 706 to conduct an examination of Alexander and determine whether he is capable of getting on and off a hospital radiation treatment table without the assistance of a lift.

### A. Alexander's September 4, 2018 TRO motion

Alexander's first motion raises several allegations concerning the conduct of staff members at DCI, which defendants have now responded to. Dkt. 122, at 2–5. Alexander's motion for an extension of time in which to reply includes 13 pages of detail related to his medical care and treatment at the hands of DCI staff, but it does not address the claims he made in his initial motion or defendants' responses, including:

- His allegation that defendants have denied his pain medications, or defendants' contention that his pain medication dosage is the same as when the court last denied Alexander's motion for a preliminary injunction challenging his doctor's medication dosage determinations. Dkt. 122, at 3.

- His allegation that he has been denied other unspecified medications.

- His allegation that defendants have denied his Ensure nutritional supplement and mouth rinse for mouth infections, or defendants' contention that these items were discontinued because they have been deemed no longer medically necessary and because nursing staff has observed him pouring them into the toilet. Dkt. 123, at ¶ 12.

- His allegation that defendants have denied him his "medical diet meals," or defendants' contention that Alexander is prescribed and continues to receive a pureed diet meal plan. Dkt. 123, at ¶ 12.

- His allegation that defendants have denied him comfortable clothing, such as sweatpants and sweatshirts, or defendants' contention that he does not have a medical need to wear only sweatpants and that he has behaved inappropriately by refusing to wear pants and exposing himself to nurses. Dkt. 122, at 4–5.

Alexander's motion for an extension of time does briefly address defendants' response to his allegation that they have denied his brother opportunities to attend his treatment consultations. Specifically, in response to defendants' assertion that Infirmary Nursing Supervisor Paula Stelsel called Alexander's brother on August 6, August 29, and September 19, 2018, to discuss Alexander's upcoming treatment appointments, Dkt. 122, at 2–3 and Dkt. 124, at ¶ 8, Alexander says that "does not believe Paula . . . personally spoke with his brother

Bobby, and has not proven that defendants . . . contacted his brother as this court has ordered." Dkt. 127, at 7. He provides no further explanation as to why he believes defendants to have misrepresented Stelsel's efforts in their response to his motion.

Because Alexander has not responded to the issues defendants raised in response to his first TRO motion, I will grant him an extension of time in which to address the issues discussed above.

**B. Alexander's September 19, 2018 TRO motion**

In his second motion, Alexander alleges that DCI staff abruptly terminated his radiation treatment and asks me to issue a TRO ordering that it be restarted. In response, defendants filed a series of briefs and declarations apprising me of the status of Alexander's treatment. Based on the parties' submissions, I understand the following to have occurred:

- On September 11, Alexander started radiation therapy at the University of Wisconsin Hospital. Alexander was reportedly hesitant to proceed, and staff spent approximately an hour in written discussions with him in the treatment room before the treatment session was ended due to his refusal. Several hours later, Alexander accepted treatment and received the first dose of radiation. A UW physician spoke to Alexander in detail about the importance of completing the radiation course without interruption, and of proceeding expeditiously once in the treatment room so as not to delay the treatment of other patients. Dkt. 124, at ¶ 2.

- On September 14, UW Radiation & Oncology staff called the DCI infirmary to inquire about Alexander's ability to transfer himself from his wheelchair to the treatment table. Infirmary staff stated that Alexander "was independent in his cell, including ADLs without any additional assistive devices. Mr. Alexander routinely utilizes a wheelchair to move around his cell." *Id.* at ¶ 3. UW staff requested that Alexander be informed that he would need to get on the treatment table himself, and that UW staff would not be picking him up or using a lift to transfer him. Infirmary staff confirmed that they had "observed him pivot transfer bed to wheelchair to toilet independently and ambulating in his room." Although infirmary staff communicated these instructions to Alexander, it was reported that while at the hospital later that day, Alexander "stood up from the wheelchair but would not pivot to the table. A lift was utilized in order to transfer him." *Id.* at ¶ 4.

3

- On September 17, infirmary staff received another phone call from UW inquiring about Alexander's ability to transfer himself in light of his statements during treatment that he was unable to do so. In follow-up conversations, UW staff noted that Alexander seemed to be unable to walk or stand only while being assisted by a woman, and the staff expressed patient and staff safety concerns about using a lift to transfer Alexander when he was able to do so independently. UW requested written documentation of Alexander's transfer abilities, which DCI provided that same day. *Id.* at ¶ 5; *see also* Dkt. 124-1 (letter from DCI to UW Radiation/Oncology stating that "Mr. Alexander has demonstrated through direct observation the ability to transfer himself independently from his bed to his wheelchair and his wheelchair to his bed here in the Infirmary" and that "he is independent in his ability to complete his other activities of daily living").

- Later that day, it was reported that Alexander had refused to stand up to transfer to the treatment table and, as a result, was considered to have refused treatment. He reported that he was experiencing considerable foot pain, but would not inform the nurse where the pain was and refused to cooperate for an examination. Later that evening, DCI staff observed Alexander "standing by the wall call light, pulling it out of the wall" and exhibiting "[n]o obvious outward signs or symptoms of pain." Dkt. 124, at ¶ 6.

- On September 18, UW again contacted the DCI infirmary and requested that they offer Alexander his daily radiation on the condition that he agree that he was willing to transfer to the treatment table. Alexander would not consent to transfer himself, and he continued to refuse on September 19 and 20, meaning that he did not receive radiation treatment on those days. *Id.* at ¶ 7.

- On September 19, Alexander filed his second TRO motion. Dkt. 119.

- On September 20, Stelsel and a DCI physician discussed with Alexander the importance of continuing the radiation treatments, and asked him if he would consider trying to transfer from his wheelchair to the treatment bed independently. Alexander agreed to try. That same day, UW staff informed the infirmary that if Alexander did not continue attending his radiation appointments, UW would discontinue the treatments because five or more missed treatments is considered detrimental to the plan of care. Dkt. 125, at 1–2.

- On September 21, Stelsel had a conversation with Alexander about UW's ultimatum. She indicated that she would send a nurse from the infirmary with Alexander to his appointment that day to assist with any transfer from the wheelchair to the treatment table. *Id.* at 2.

4

Defendants did not file any subsequent supplemental briefing about whether Alexander resumed treatment on September 21. On September 29, Alexander filed his motion for an extension of time, in which he states that his radiation treatments "were immediately terminated for over a week because . . . UW [and] DCI refused to aid plaintiff [in getting on the] table." Dkt. 127, at 3. Alexander's statement is ambiguous as to whether he has resumed treatment. However, Alexander is unequivocal that he "has not been able to stand or walk without falling and being injured since his surgery" in January 2018. *Id.* at 4. This is plainly at odds with statements in defendants' filings, and this factual discrepancy is not one that I can resolve based on the parties' submissions alone.

In an effort to resolve these issues expediently, I will order the following: By October 22, 2018, defendants must update the court as to the status of Alexander's radiation treatments and whether the parties have resolved the transfer issues to the satisfaction of both parties. Defendants must also provide the name of a disinterested UW doctor who will, if ordered by the court, conduct an examination of Alexander aimed at resolving any outstanding factual discrepancies about Alexander's physical capabilities. If, after reviewing defendants' October 22 submissions, I determine that assessment by an independent expert is necessary, I will immediately appoint the UW doctor as an expert witness as provided for by Rule 706(a). The parties will split the cost of this expert 50/50, with Alexander's share coming from the court's pro bono reimbursement fund to the extent that it is within the fund's disbursement limits. If the cost of Alexander's share exceeds the amount available from the pro bono fund, the court will expect the state to pay the rest.

ORDER

IT IS ORDERED that:

1. Plaintiff Robert Alexander's motion for extension of time in which to respond, Dkt. 127, is GRANTED with respect to the allegations discussed above relating to his first TRO motion, Dkt. 115, but is DENIED with respect to the allegations raised in his second TRO motion, Dkt. 119. Alexander must file his response no later than October 22, 2018.

2. By October 22, 2018, defendants must file an additional update concerning the status of Alexander's treatment as well as the name of a disinterested UW doctor willing to serve as an independent expert if called upon to do so.

Entered October 10, 2018.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge